**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4039-21

ALEXANDER NICOLAS,

    Plaintiff-Appellant,

v.

TRENTON BOARD OF
EDUCATION, FREDERICK
H. MCDOWELL, JR., in his
individual and official capacity,
LISSA JOHNSON, in her
individual and official capacity,

    Defendants-Respondents.

_____

Argued November 28, 2023 – Decided January 17, 2024

Before Judges Natali and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-1718-18.

Alexander Nicolas, appellant, argued the cause pro se.

Cherie Lee Adams argued the cause for respondents (Adams Gutierrez & Lattiboudere, LLC, attorneys; Cherie Lee Adams, of counsel and on the brief; Audra A. Pondish, on the brief).

PER CURIAM

Plaintiff Alexander Nicolas appeals from an August 5, 2022 Law Division order granting summary judgment to defendants Trenton Board of Education, Frederick H. McDowell, Jr., and Lissa Johnson (collectively, defendants) and dismissing with prejudice his complaint alleging employment discrimination in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. We affirm.

I.

We begin by reviewing the facts in the summary judgment record, taken in the light most favorable to plaintiff as the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

Plaintiff is a Spanish teacher in the Trenton School District with over twenty years of education experience. He is a naturalized American citizen from Panama and holds Bachelor of Science, Master of Education, and Doctor of Philosophy degrees, as well as New Jersey certificates to be a world language teacher, supervisor, principal, and school administrator; Florida certificates to be a world language teacher and principal; and a Pennsylvania certificate to be a principal. Defendant McDowell was the superintendent of schools for the Board between July 2017 and August 2019, and defendant Johnson was the

assistant superintendent overseeing the Board's human resources department between June 2015 and June 2018.

The genesis of the parties' dispute arose in 2007 when plaintiff began working as a teacher leader at Daylight/Twilight High School in Trenton. As he testified at his deposition, his responsibilities included "scheduling, meeting with the teachers, conducting staff meetings, [and] all the responsibilities [of] the head administrator." Plaintiff also stated, however, the position was essentially "powerless" because it "could not make administrative decisions to restructure and run the school operation, or . . . on staff placement." He claims to have "repeatedly attempted to contact administration" about problems at Daylight/Twilight such as poor working conditions and lack of necessary resources and staff, but the Board refused to address his complaints.

As a result, plaintiff averred he suffered physical, mental, and psychological problems resulting in his hospitalization and eventually extended sick leave. He filed a complaint with the Equal Employment Opportunity Commission (EEOC) in 2008 which was "closed with a [n]o [c]ause determination." The teacher leader position at Daylight/Twilight was eliminated in the 2008-2009 school year.

A-4039-21

In November 2011, plaintiff and his wife, Vashti Nicolas, filed a Law Division complaint against the Board, its then-current superintendent and two assistant superintendents, which included LAD claims substantially similar to those brought here. In that complaint, plaintiff asserted he applied for multiple administrative positions between 2005 and 2007, and in 2010, but the Board hired less qualified applicants outside his protected class.

In February 2016, the Board and plaintiff, while represented by counsel, entered a settlement agreement covering "all claims between the parties arising from [p]laintiff's employment with the Board . . . up to and through the date of th[e] [a]greement, including, but not limited to, all claims arising under any employment-related law . . . [and] all claims for discrimination . . . ." Plaintiff further agreed to release all claims against the Board "resulting from anything which has happened up until and through the date of execution of th[e] [a]greement" and to dismiss the 2011 complaint with prejudice.

The Board denied any liability but agreed to waive its claim for reimbursement of its contribution toward plaintiff's health insurance, provide certain documents to plaintiff, and remove certain items from plaintiff's official personnel file. Both parties also agreed "not to retaliate against each other," but the agreement did not define the term "retaliate."

Plaintiff alleged in his complaint the settlement agreement was entered "under the preten[s]e that the new administration of the [Board] w[ould] consider [p]laintiff for upcoming administrative positions." The language of the agreement, however, includes no such provision and, in fact, expressly states it "sets forth the complete understanding and entire [a]greement between the [p]arties" and "[b]y executing this [a]greement, [p]laintiff represents and acknowledges that he does not rely, and has not relied upon, any representation or statement not set forth in this [a]greement . . . ."

Between 2011 and 2017, plaintiff claims he applied for numerous open administrative positions with the Board, each of which he was qualified for, but was not interviewed or hired due to his national origin and the past and current litigation between the parties. Instead, plaintiff averred, the Board again hired less qualified individuals outside his protected class. As a result, plaintiff filed a second EEOC complaint in September 2017, again alleging the Board discriminated against him. The EEOC found it was "unable to conclude that the information [provided] established a violation of law" and informed plaintiff he "had the right to initiate a private cause of action."

On August 3, 2018, plaintiff and his wife, acting pro se, filed the complaint at issue here, asserting LAD claims based on racial/national origin

discrimination, retaliation by failure to promote or hire, aiding and abetting discrimination based on retaliation by failure to promote and refusal to interview. Plaintiff sought compensatory and punitive damages, front-pay, back-pay, and attorneys' fees and costs. Plaintiff later amended his complaint to remove his wife as a plaintiff and add claims for breach of contract and guaranty, based on defendants' alleged breach of the non-retaliation provision of the settlement agreement, contrary to the LAD and Title VII of the Civil Rights Act of 1964.

Before us, plaintiff argues he submitted "300 applications . . . for administrative positions with the [Board]" and his claims are "not just based on a few positions." In support, he submitted his application submission history for Board positions and job descriptions for certain positions sought. His complaint, however, provided specific details for only six positions.

Specifically, plaintiff stated he applied for two "[d]istrict [w]ide" principal positions, one of which related to focus and priority schools,[1] on July

---

[1] Focus schools are those with "room for improvement in areas that are specific to the school," including low graduation rates, large proficiency gaps between student subgroups, and low subgroup proficiency rates compared statewide. Tech. Overview of the Calc. of Priority, Focus, and Reward Schools, N.J. Dep't of Ed., https://www.nj.gov/education/reform/PFRschools/TechnicalGuidance.pdf

7, 2017. Next, plaintiff asserted he applied for the principal positions at Grant and Robbins Elementary Schools on July 15, 2017. Finally, he stated he applied to be a special education supervisor on November 4, 2017, and a "S[TEM]² Elementary" supervisor on an unspecified date.

Following the amendment of the complaint, defendants removed the action to federal court, asserting plaintiff's invocation of Title VII implicated a federal question. Plaintiff moved to remand which the court granted after finding plaintiff's claims sounded in state law and cited Title VII only as "one of multiple sources for a standard of retaliation to support his state law claim."

On remand, defendants jointly moved to dismiss under Rule 4:6-2(e). In support, they argued: (1) all claims accruing prior to February 22, 2016 were barred by the release in the settlement agreement, (2) all claims accruing prior to August 3, 2016 were time-barred by the LAD's two-year statute of limitations, and (3) plaintiff failed to establish the necessary elements for any of his claims.

---

(visited Nov. 13, 2023). Priority schools are those "identified as among the lowest-performing five percent of Title I schools in the state over the past three years, or any non-Title I school that would otherwise have met the same criteria." Ibid.

[2] STEM stands for science, technology, engineering, and mathematics.

A-4039-21

After hearing oral arguments, the court issued a written order on March 13, 2020 granting in part and denying in part defendants' motion. The court agreed with defendants that the portions of plaintiff's claims accruing prior to February 22, 2016 were barred by the settlement agreement and those accruing prior to August 3, 2016 were barred by the statute of limitations. It also dismissed the breach of guaranty claim without prejudice.[3]

Defendants thereafter jointly moved for summary judgment, reprising many of the arguments presented in their Rule 4:6-2(e) dismissal motion. Defendants asserted plaintiff was unqualified for the positions he sought and therefore could not establish discrimination under a failure to hire or promote theory. On this point, they noted plaintiff did not possess an educational services or special education certificate, "five years of successful administrative or supervisory experience in special education," or "an educational services certificate as a child study team member," as required to be a special education supervisor, or the mathematics or science certificate required to be a STEM supervisor.

---

[3] The court's order indicated it set forth its statement of reasons on the record, but neither party included the transcript from that hearing in the record before us.

A-4039-21

Defendants also maintained plaintiff lacked sufficient administrative or supervisory experience, three years of which was required for any principal position, and five years of which was required for principal at a focus and priority school. Even if plaintiff were qualified, defendants explained, he presented no evidence demonstrating he was more qualified than the applicants selected, or that defendants took adverse action against him because of his national origin.

Next, defendants contended plaintiff failed to establish his past complaints were the reason he was neither interviewed nor promoted. They asserted the human resources staff screening applications had "no knowledge of [p]laintiff's prior concerns," and thus could not have excluded his applications on that ground. Rather, defendants argued they screened his applications because he was not qualified.

Defendants also asserted plaintiff's breach of contract claim based on the settlement agreement was without merit because plaintiff failed to raise a genuine and material question of fact that defendants retaliated against him. Finally, defendants McDowell and Johnson argued they were not individually liable for aiding and abetting because the motion record failed to create a factual dispute that either engaged in "active or purposeful conduct."

9

In her certification, Johnson specifically attested she oversaw the human resources department but was not directly involved in screening applications or determining whether applicants were qualified for an interview. Johnson stated "[h]uman [r]esource generalists" initially reviewed applications for the Board, comparing each applicant's qualifications to the criteria in each job posting "to determine if the applicant met the basic requirements for the posted vacancy." The candidate "would not move to the interview process" if they "did not meet the qualifications of the position." Following an interview, Johnson explained, the committee would recommend the successful candidate, who she "would present . . . to the Superintendent." Johnson denied "at any time during [her] employment in Trenton tak[ing] any action impacting the employment of [plaintiff]."

In McDowell's certification, he similarly stated he "did not participate in screening, reviewing qualifications or interviewing of potential candidates." Rather, he explained "[i]nterviews for certified administrative positions were generally conducted by a committee made up of administrative staff relevant to the particular position." The committee's "recommended candidate would be forwarded to [McDowell] for submission to the Board . . . for a vote on appointment."

10

McDowell also denied "provid[ing] an[y] input or hav[ing] any role in determining whether [plaintiff] was interviewed for a particular position during the time [he] served as [s]uperintendent in Trenton, . . . tak[ing] any action involving the employment of [plaintiff]" or "handl[ing] any complaints filed by [p]laintiff."  He explained the superintendent role "does not entail conducting investigations" and "[t]o the extent [p]laintiff copied [him] on any correspondence regarding an employment concern, it was forwarded to human resources to be handled and for any necessary actions to be taken."  Finally, he added he "was not personally aware of any prior disputes involving [plaintiff] before" starting as superintendent in 2017.

In opposition, plaintiff relied upon many of the allegations in his complaint and argued the statute of limitations did not bar his claims because defendants' actions constituted continuous tortious conduct.  Without further explanation, plaintiff also noted defendants' summary judgment motion contained a "procedural defect."

In arguing he established the prima facie elements of each of his claims, plaintiff claimed defendants' "inadequate response to [his] whistleblowing" demonstrated a causal connection between his EEOC and Law Division

11

complaints and defendants' adverse action against him.[4] Plaintiff asserted defendants' failure to meaningfully address his "letters and concerns" was a violation of the duty of care defendants owed him as "the officers in charge" and under the parties' contract. These same letters and other correspondence, according to plaintiff, showed defendants were aware of his protected activity.

Plaintiff also argued McDowell and Johnson should be considered his employer because, under CEPA, an employer includes a "person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent," N.J.S.A. 34:19-2(a), and Title VII defines employer as "one or more individuals" and agents of "a person engaged in an industry affecting commerce who has fifteen or more employees," 42 U.S.C. § 2000e(b). As to his qualifications, plaintiff asserted several of his certificates are "above" the certificates required for the positions he sought; he had the required administrative experience between an internship, his teacher leader

---

[4] Before us, as he did before the trial court, plaintiff often relies upon the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14; however, his complaint did not assert any CEPA claims. Although courts have occasionally interpreted LAD and CEPA together, they are "statutes that have their own distinct purposes and are worded differently to achieve those purposes." Sauter v. Colts Neck Volunteer Fire Co. No. 2, 451 N.J. Super. 581, 595 (App. Div. 2017) (quoting Donelson v. DuPont Chambers Works, 206 N.J. 243, 261-62 (2011)).

position, and work in Panama; and he was "more educated than other candidates."

The court issued an order granting defendants summary judgment and explained its reasons in an oral decision placed on the record after considering the parties' submissions and oral arguments. The court stated its role was not "to substitute its judgment as to how to run a . . . school system" but "to determine whether any of the claims articulated by plaintiff are such that they require the matter to go before a jury," citing the applicable standard under <u>Brill</u>, 142 N.J. at 528-29. It further noted "a certain commonality among all these remaining counts in the complaint in that they are based upon the legal theory . . . that plaintiff alleges he was discriminated [against] by retaliating," which plaintiff characterized as "not being called for interviews . . . for positions he's applied and not being selected [for those positions]."

First, although the court found plaintiff "feels that he has the equivalent of certain of these criteria" in the job postings, it concluded "nothing in this record," including plaintiff's deposition testimony, showed plaintiff "has the actual criteria that are set forth in the specific postings." Next, the court found plaintiff's applications did not make it past the screening stage, and thus "did not give rise to aiding and abetting liability on the two individual defendants

because in this motion record, there's no genuine issue . . . as to their having any role in th[e] screening process."

Finally, the court noted plaintiff's breach of contract claim was "based on clear contract terms in the settlement agreement that require that there will be no retaliation" but found plaintiff had not shown retaliation and had "attribute[d] certain events to a retaliatory motive that is not warranted in this motion record." This appeal followed.

## II.

Before us, plaintiff argues the court erred by granting summary judgment and dismissing his complaint. In support, he reprises many of his arguments made before the court. Since he has established the prima facie elements of his claims, plaintiff contends, "the burden shifts to the employer [defendants]," who he claims "never submitted any evidence showing that the decision not to call [p]laintiff for [an] interview, retaliate, and ignore [p]laintiff['s] correspondences were made because of a nondiscriminatory and legitimate reason." As to the individual defendants, he again relies upon the definitions of "employer" used in CEPA and federal law to contend they are liable on each claim.

In requesting we affirm, defendants similarly reprise their arguments made before the court. They argue plaintiff failed to establish a prima facie case

of discrimination on each of his claims because he was not qualified for the positions he identified in his complaint. Relying on Chou v. Rutgers, State Univ., 283 N.J. Super. 524, 540 (App. Div. 1995), defendants contend "no inference of discrimination can be drawn" if a hiring decision "is reasonably attributable to an honest even though partially subjective evaluation of [the applicant's] qualifications." Even assuming he were qualified, defendants further argue, plaintiff offered no evidence showing he was more qualified than the applicants ultimately selected, or that any hiring decisions were made based on discriminatory animus.

We first address the applicable standards of review guiding our analysis followed by a discussion of the applicable legal principles. In subsections III.A-E, we address plaintiff's specific arguments challenging the court's summary judgment order.

"We review decisions granting summary judgment de novo," C.V. v. Waterford Twp. Bd. of Educ., 255 N.J. 289, 305 (2023), applying the same standard as the trial court, Townsend v. Pierre, 221 N.J. 36, 59 (2015). Like the motion judge, we "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in

favor of the non-moving party." C.V., 255 N.J. at 305 (quoting Samolyk v. Berthe, 251 N.J. 73, 78 (2022)). "Summary judgment is appropriate if 'there is no genuine issue as to any material fact' and the moving party is entitled to judgment 'as a matter of law.'" Ibid. (quoting R. 4:46-2(c)).

Materials considered include "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any." Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting R. 4:46-2(c)). "[S]elf-serving assertions, unsupported by documentary proof in the[ party's] dominion and control, '[are] insufficient to create a genuine issue of material fact.'" Miller v. Bank of Am. Home Loan Servicing, L.P., 439 N.J. Super. 540, 551 (App. Div. 2015) (second alteration in original) (quoting Heyert v. Taddese, 431 N.J. Super. 388, 414 (App. Div. 2013)).

Our review of the application of a statute of limitations period to bar a cause of action is de novo. Save Camden Pub. Schs. v. Camden City Bd. of Educ., 454 N.J. Super. 478, 487 (App. Div. 2018). The construction of contract language is also a question of law subject to de novo review unless its "meaning is both unclear and dependent on conflicting testimony." Celanese Ltd. v. Essex Cnty. Improv. Auth., 404 N.J. Super. 514, 528 (App. Div. 2009). Under the de novo standard, the "trial court's interpretation of the law and the legal

consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

"It is well-established that the LAD's overarching goal is the 'eradication of the cancer of discrimination.'" Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 546 (2013) (quoting Fuchilla v. Layman, 109 N.J. 319, 334 (1988)). To achieve that goal, courts "have recognized and given effect to the LAD's broad remedial purposes." Ibid. It is a violation of the LAD "for an employer, because of the race, . . . [or] national origin . . . of any individual . . . to refuse to hire or employ . . . such individual or to discriminate against [them] in compensation or in terms, conditions or privileges of employment." N.J.S.A. 10:5-12(a).

Additionally, the LAD makes it unlawful "for any person to take reprisals against any person because that person has opposed any practices or acts forbidden under [the LAD] or because that person has . . . filed a complaint . . . under [the LAD]," N.J.S.A. 10:5-12(d), or for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the LAD], or to attempt to do so," N.J.S.A. 10:5-12(e).

17

Our Supreme Court has held "the plain meaning of the definition of employer in the LAD does not include a supervisor." Cicchetti v. Morris Cnty. Sheriff's Off., 194 N.J. 563, 594 (2008); see also Tarr v. Ciasulli, 181 N.J. 70, 83 (2004). Accordingly, "individual liability of a supervisor for acts of discrimination . . . can only arise through the 'aiding and abetting' mechanism [set forth in N.J.S.A. 10:5-12(e)] that applies to 'any person.'" Cicchetti, 194 N.J. at 594 (quoting N.J.S.A. 10:5-12(e)).

New Jersey has adopted the "procedural burden-shifting methodology" originally set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), to analyze employment discrimination claims under the LAD. Meade v. Twp. of Livingston, 249 N.J. 310, 328 (2021). Under this framework, the plaintiff must first "come forward with sufficient evidence to constitute a prima facie case of discrimination." Ibid. (quoting Henry v. Dep't of Human Servs., 204 N.J. 320, 331 (2010)). At this stage, the plaintiff's burden is "rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination could be a reason for the [defendant]'s action." Id. at 329 (quoting Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005)).

A-4039-21

Once the plaintiff has met this burden, "a presumption that the employer unlawfully discriminated against the employee" arises, ibid. (quoting Bergen Com. Bank v. Sisler, 157 N.J. 188, 211 (1999)), and "the defendant must then show a legitimate nondiscriminatory reason for its decision," id. at 328 (quoting Henry, 204 N.J. at 331). Upon that showing, "the presumption of unlawful discrimination disappears." Id. at 329. Finally, the burden shifts back to the plaintiff "to show that defendant's stated reason was merely a pretext or discriminatory in its application." Id. at 328. "Although the burden of production shifts throughout the process, the [plaintiff] at all phases retains the burden of proof that the adverse employment action was caused by purposeful or intentional discrimination." Id. at 330 (quoting Bergen Com. Bank, 157 N.J. at 211).

Here, we are satisfied plaintiff failed to establish a prima facie case of discrimination on any of his claims. Further, and as detailed in our opinion, defendants presented a legitimate, nondiscriminatory reason for their actions—plaintiff's lack of qualifications for the positions he sought and the relatively stronger qualifications of the successful candidates identified.

A. Statute of Limitations

As an initial matter, plaintiff argues the court erred in determining the portions of his claims involving applications submitted prior to August 3, 2016 were barred by the statute of limitations.[5]  In support, he asserts defendants' actions were part of a "continual, cumulative pattern of tortious conduct" which tolled the limitations period "until the wrongful conduct ceases," under the continuing violation doctrine.  Roa v. Roa, 200 N.J. 555, 566 (2010) (quoting Wilson v. Wal-Mart Stores, 158 N.J. 263, 272 (1999)).  We disagree.

As the court correctly noted, the statute of limitations for the LAD is two years.  Henry, 204 N.J. at 332.  The continuing violation doctrine permits a plaintiff to "pursue a claim for discriminatory conduct if he or she can demonstrate that each asserted act by a defendant is part of a pattern and at least one of those acts occurred within the statutory limitations period."  Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 6-7 (2002).  The doctrine "was developed to allow for the aggregation of acts, each of which, in itself, might not have alerted

---

[5]  Plaintiff did not identify the court's March 13, 2020 order finding his claims were time-barred in his notice of appeal as required under Rule 2:5-1(f)(2)(ii). Nevertheless, we consider his arguments in keeping with the court's practice of affording a certain degree of leeway to pro se litigants.  See Rubin v. Rubin, 188 N.J. Super. 155, 159 (App. Div. 1982).

the [plaintiff] of the existence of a claim, but which together show a pattern of discrimination." Roa, 200 N.J. at 569. It does not, however, allow "the aggregation of discrete discriminatory acts for the purpose of reviving an untimely act of discrimination that the [plaintiff] knew or should have known was actionable." Ibid.

The Court explained "some discrete acts, 'such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.'" Id. at 566-67 (emphasis added) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002)). Simply put, "individually actionable allegations cannot be aggregated" for purposes of the continuing violation doctrine and must be asserted within their individual limitations periods. Id. at 567 (quoting O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006)).

Although plaintiff alleges defendants' actions constitute a pattern of discrimination and retaliation against him, at bottom his claims assert multiple discrete acts of failure to promote. Plaintiff knew these allegedly discriminatory acts could be actionable, as demonstrated by his filing the 2011 Law Division complaint and multiple EEOC complaints regarding similar if not identical claims. The continuing violation doctrine simply does not apply to these facts. See, e.g., Smith v. Twp. of E. Greenwich, 519 F. Supp. 2d 493, 505-06 (D.N.J.

21

2007) (holding continuing violation doctrine inapplicable to claim alleging several failures to promote under LAD and 42 U.S.C. § 1983); Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 483-84 (3d Cir. 1997) (declining to apply continuing violation doctrine to Title VII failure to promote claim); Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 157 (2d Cir. 2012) (finding continuing violation doctrine does not apply to claim alleging pattern of failures to promote under Title VII); Heath v. Bd. of Supervisors for the S. Univ. & Agric. & Mech. College, 850 F.3d 731, 741-42 (5th Cir. 2017) (holding Title VII retaliation claims based on discrete acts cannot rely on continuing violation doctrine).

B. Discrimination Claim Under the LAD

1. Plaintiff's Qualifications

As noted, plaintiff also claims the court improperly determined he was unqualified for the positions he sought and thus failed to establish a prima facie case of discrimination. He specifically asserts he had "three or more years of administrative experience," and as to the special education and STEM positions, "clearly articulated during oral argument [before the court] that an educational manager will not be certified in every content area when it pertains to a school operation." We disagree with each of these arguments.

22

To state a prima facie case, a plaintiff asserting a claim of discrimination based on a failure to promote must establish they: (1) are a member of a class protected by the LAD; (2) are "qualified for the position . . . sought"; (3) were "denied promotion"; and (4) "others with similar or lesser qualifications" were selected for the position. Chou, 283 N.J. Super. at 538. As our Supreme Court noted, "[i]t would be impossible to list all the criteria that are included in qualifications for promotion in all jobs." Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 85 (1978). Examples include "educational level, job experience and, most importantly, the quality of work performed." Ibid.

Further, the LAD "do[es] not permit courts to make personnel decisions for employers [but] simply require[s] that an employer's personnel decisions be based on criteria other than those proscribed by law." Jason v. Showboat Hotel & Casino, 329 N.J. Super. 295, 308 (App. Div. 2000) (quoting Peper, 77 N.J. at 87). The evaluation of an employee's qualification is based upon objective criteria. Pilkington v. Bally's Park Place, Inc., 370 N.J. Super. 140, 168 (App. Div. 2003) (Wecker, J., dissenting), rev'd on dissent, 180 N.J. 262 (2004); cf. Viscik v. Fowler Equip. Co., 173 N.J. 1, 21 (2002) (noting "in addressing the second prong of McDonnell Douglas, as modified [for a termination case], the standard is an objective one"); see also Zive, 182 N.J. at 454 (stating "although

23

the second prong in a termination case necessarily requires refinement to address the differences between failing-to-hire and firing, it is not intended to impose a heavier burden on the plaintiff").

Even considering the motion record in the light most favorable to plaintiff, as required under Brill, 142 N.J. at 540, we are satisfied plaintiff failed to create a genuine and material factual question regarding his qualifications for the STEM or special education supervisor positions. Indeed, plaintiff does not dispute he did not possess the certificates clearly required by the Board for STEM supervisors (certificate in mathematics, required, and in science, preferred) or special education supervisors (certificate in educational services or special education.) Instead, he argues his certificates are "above" the requirements and an administrator is not typically "certified in every content area."

Here, the record fully supports the Board's position it required certification in the subject areas at issue in addition to a supervisory or administrative certification. Indeed, the job descriptions in the record clearly state a candidate "shall . . . [h]old a New Jersey standard certificate in Mathematics (required) and Science (preferred)" and "[m]ust possess appropriate New Jersey Educational Services Certification as related to Child

24

Study Teams or Special Education Teacher Certificate or Certificate of Eligibility," respectively. Plaintiff points to no competent evidence indicating the descriptions submitted were incorrect or the Board did not adhere to these descriptions in its hiring decisions.

We are not persuaded by plaintiff's claim his certificates were "above" the stated requirements for each position. Different certificates "represent distinct and separate areas spanning the entire field of public education, and the different certificates relate to discrete and distinctive categories of functions, duties, and responsibilities of educators." Dennery v. Bd. of Educ., 131 N.J. 626, 637 (1993). Consequently, the requirements for each type of certificate vary. See, e.g., N.J.A.C. 6A:9B-9.1 (instructional certificate in particular subject area requires at least thirty credits of "courses appropriate to the subject area" with at least twelve "at the advanced level of study" and "appropriate State test(s) of subject matter knowledge"); N.J.A.C. 6A:9B-12.4 (administrator certificate requires master's degree in educational leadership, 150-hour internship, a "State-approved examination" and "five years of successful educational experience"); N.J.A.C. 6A:9B-14.1 (educational services certificate requires "appropriate degree," "Department-required test(s)," and college-level educational services program). Accordingly, we disagree with plaintiff and are satisfied the

educational services, math, and science certificates are not subsumed by the administrative certificate.

Next, plaintiff asserts he has the requisite administrative experience, pointing to his one-year administrative internship, "experience as a [t]eacher [l]eader and [h]ead administrator, experience as adjunct professor, and administrative experience overseas." We are again unpersuaded.

Although we are satisfied plaintiff has shown he possessed twenty-nine months of relevant administrative experience between his teacher leader position and administrative internship, the record does not reflect he had the requisite three years' experience, even considering the motion record in the light most favorable to him. Plaintiff presented no competent evidence establishing his "administrative support" or adjunct professor positions were relevant administrative experience, nor that the Board should have made an exception to its policy of not considering international experience.

Plaintiff specifically contends he possessed administrative or supervisory experience as: principal of a "middle senior high school" in Panama from December 1992 to September 1993 (ten months), vice principal of the same school from September 1993 to June 1994 (ten months), "administrative support" at Holland Middle School from September 2002 to December 2003

(fifteen months), principal internship at Holland Middle School from January 2004 to June 2005 (eighteen months), teacher leader at Daylight/Twilight High School (no dates provided), and head administrator at Daylight/Twilight High School from October 2007 to 2008 (no month provided). Plaintiff also notes he "[s]upervise[d] and evaluate[d] graduate student teaching" and "[e]valuate[d] teaching by colleagues" in his position as adjunct professor at Mercer County Community College from September 2015 to 2018 (no month provided).

Despite being listed twice on his resume, plaintiff's position at Daylight/Twilight was officially teacher leader, not head administrator. In the complaint, he states he "was sent as a [t]eacher [l]eader to run or operate as a school principal Daylight/Twilight" in 2007. In his deposition, plaintiff confirms "the dates that [he was] what [he] refer[red] to as head administrator, but [his] title was teacher leader . . ., w[ere] October 2007 to 2008." Plaintiff also noted the teacher leader position was "eliminated" in the 2008-2009 school year and provided in his appendix a "Personnel Action Request" form indicating his extended medical leave began September 1, 2008. Thus, accepting plaintiff's claim he started as teacher leader in October 2007, he would have held this position for no more than eleven months.

While characterizing the teacher leader position as administrative on his resume, plaintiff described it in his complaint as "powerless" because "it could not make administrative decisions to restructure and run the school operation, or . . . on staff placement." In his deposition, plaintiff indicated he was responsible for "scheduling, meeting with the teachers, conducting staff meetings, [and] all the responsibilities [of] the head administrator," but conceded he did not have "an administrative title at that time" and the position was covered by the teachers' contract. Neither party submitted the job description of the teacher leader as set by the Board. However, viewing the evidence in the light most favorable to plaintiff, we are satisfied this position could fairly be considered administrative or supervisory and we thus find he had at least eleven months of administrative experience.

In contrast, plaintiff presented no evidence creating a material and factual question as to why the Board should have accepted his Panamanian experience. He confirmed in his deposition he had graduated high school "less than four years" prior to his position as vice principal and principal in Panama, he "did not yet even have a bachelor's degree," and no certifications were required for either position. Plaintiff explained "in Panama . . . everything works a little different, not like here." As plaintiff acknowledged, Johnson informed him the

Board does not consider international experience. In light of the qualification differences for the Panamanian positions and the Board's practice of excluding international experience, the record does not support plaintiff's contention this experience should have been considered toward his qualification for the principal positions.

Next, as to the administrative support role at Holland Middle School, in his deposition, plaintiff stated his official position at that time was "just teacher of Spanish" but he was "working with the school principal" and "they would give [him] assignments . . . to complete regarding administrator, administrative assignments." He provided no further details as to what these assignments were or why completing extra work in his position as a Spanish teacher should be considered relevant administrative experience. Indeed, "conclusory and self-serving assertions by one of the parties are insufficient to overcome the [summary judgment] motion." Puder v. Buechel, 183 N.J. 428, 440-41 (2005).

Finally, plaintiff has provided no support beyond conclusory statements for his assertion that adjunct professor is a supervisory or administrative position. He did not testify about this experience in his deposition, nor did he provide an affidavit, certificate, or documentary support. Neither of the letters in the record from Mercer County Community College's Vice President for

Academic Affairs and Assistant Dean refer to any administrative or supervisory duties plaintiff performs, nor do they provide competent support for plaintiff's contention that supervising graduate students teaching at a college level is equivalent to running a K-12 school and supervising licensed teachers such that this experience should be considered for his qualifications.

In sum, even viewing the evidence in the light most favorable to plaintiff, the record does not demonstrate a material and factual question about plaintiff's supervisory or administrative experience. He has not provided competent evidence to prove his Panamanian experience, "administrative support" while working as a Spanish teacher, or adjunct professor experience should be considered in this calculation. Between plaintiff's eighteen-month internship and eleven months as teacher leader, he demonstrates only twenty-nine months of supervisory or administrative experience, almost a year short of the three-year minimum requirement. Accordingly, we are satisfied plaintiff has failed to demonstrate a material and factual question about his qualification for the principal positions he sought and thus has not stated a prima facie discrimination claim.

While plaintiff maintains before us he has submitted "300 applications . . . for administrative positions with the [Board]" and his claims are "not just based

on a few positions that [he] has applied for," he failed to identify those applications in his complaint, or any information as to the candidates who eventually were hired for the positions. See Bauer v. Nesbitt, 198 N.J. 601, 610 (2009) (noting "[t]he basic function of a complaint is to 'fairly apprise an adverse party of the claims and issues to be raised at trial'" (quoting Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 75 (1990))). The record further contains no evidence regarding the qualifications for many of the positions listed in plaintiff's job application history, such as substitute principal, chief academic officer, or "administration – curriculum and instruction."[6]

2. Qualifications of Successful Applicants

Even assuming plaintiff was qualified for any of the positions to which he applied, he presented no competent evidence to show the successful candidates for any of those positions had lesser or similar qualifications. Indeed, he failed to provide any evidence identifying those individuals or their qualifications. Instead, plaintiff relied on the allegations in his complaint, in which he asserted the candidates hired were "outside [his] protected class," did not "possess

_____

[6] We note the exhibits included in plaintiff's appendix are not labeled consistently with the "exhibit chart" accompanying his opposition to summary judgment. See R. 2:6-1(b) (providing "[t]he filing date of each included paper [in the appendix] shall be stated at the head of the copy as well as its subject matter (e.g., Pretrial Order, Notice of Appeal)").

31

certificates from the [s]tate of New Jersey to serve as [p]rincipals, [s]upervisors, or [s]chool [a]dministrators" and did not have "previous teaching or administrative experience."

Not only are those allegations insufficient to defeat a properly supported summary judgment motion, see Miller, 439 N.J. Super. at 551 and Puder, 183 N.J. at 440-41, they are simply belied by the competent proofs in the record. Johnson attested in her certification the positions were given to qualified applicants and provided those individuals' resumes. For example, defendants explained Zebbie Belton was chosen for principal of Robbins Elementary. Her resume reveals she possessed principal and supervisor certificates and served in administrative positions, including vice principal, literacy leader, and summer school coordinator, since 2012. Additionally, Terry Lane, who was chosen for principal of the focus and priority school Grant Elementary, held principal and supervisor certificates and had been a vice principal since 2008, serving as summer school principal for three summers and interim principal for six months. Each of these candidates possessed the necessary certificates and had more administrative experience than plaintiff.

C.  Retaliation Claims Under the LAD

Plaintiff next argues the court erred in concluding he failed to establish the elements of his claim for retaliation.  He asserts his protected conduct included filing an EEOC complaint, filing a lawsuit, and communicating with supervisors about the discrimination to which he was subjected.  Because "an employer's inadequate response to an employee's whistleblowing can be construed as evidence, albeit indirect, of a causal connection between the employee's complaint . . . and the employer's [adverse] action," he concludes defendants' knowledge of his EEOC complaints and failure to respond to his correspondence proves the causal connection between his protected conduct and defendants' failure to promote him.  Again, based on competent proofs in the motion record, we disagree.

To establish a prima facie retaliation claim under the LAD, the plaintiff must show:  (1) "they engaged in protected activity"; (2) "the activity was known to defendant[]"; (3) plaintiff was subject to an adverse employment decision; and (4) "there was a causal link between the protected activity and the adverse action."  Morris v. Rutgers-Newark Univ., 472 N.J. Super. 335, 352 (App. Div. 2022) (citing Battaglia, 214 N.J. at 547).  "[T]he mere fact that [an] adverse employment action occurs after [the protected activity]" generally will not

"satisfy the plaintiff's burden of demonstrating a causal link between the two." Young v. Hobart W. Group, 385 N.J. Super. 448, 467 (App. Div. 2005) (second and third alterations in original) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)). "Only where the facts of the particular case are so 'unusually suggestive of retaliatory motive' may temporal proximity, on its own, support an inference of causation." Ibid. (quoting Krouse, 126 F.3d at 503).

Here, plaintiff has failed to demonstrate the individuals involved in the alleged retaliation knew of his protected activity. Cf. Young, 385 N.J. Super. at 466 (finding knowledge element not proven when plaintiff made complaints to corporate executive but individuals who terminated plaintiff claimed no knowledge of those complaints). In fact, he presented no competent evidence establishing the human resources generalists who made the decision not to pass his applications to the interview stage had any knowledge of his protected activity. The record does not evidence plaintiff sent any of the emails regarding his complaints to these generalists.

Plaintiff asserts Johnson and McDowell had knowledge of his protected activity due to various emails he sent on the matter, but Johnson's and McDowell's unrebutted certifications reflect they were not involved in application screening. In response to the court's direct inquiry on this point,

plaintiff pointed to no contrary evidence beyond bald assertions. Nothing in the record suggests a reasonable inference that Johnson or McDowell had any role in screening plaintiff's applications or declining to interview him. As noted in their certifications, Johnson and McDowell did not become involved in the hiring process until a successful candidate was recommended by the interview committee. We agree with the court the record shows plaintiff's applications were screened out by other staff prior to reaching the interview phase.

Additionally, plaintiff has not demonstrated a causal link between his complaints and the Board's decision not to promote him. The fact that plaintiff made complaints and subsequently was not promoted is not sufficient to prove causation under the present facts. As noted, plaintiff was simply not qualified for the positions he sought.

We are unpersuaded by plaintiff's argument the Board's "inadequate response to [his] whistleblowing" is sufficient to establish a causal connection under the LAD and plaintiff cites no case law in support. Even accepting plaintiff's reliance on CEPA case law, we are not convinced the record supports such a claim. McDowell's unrebutted certification indicates the correspondence plaintiff sent about his concerns were "forwarded to human resources to be handled and for any necessary actions to be taken." Further, as noted, nothing

35

in the record supports a reasonable inference that the individuals responsible for addressing plaintiff's complaints were also responsible for screening his applications.

D. Aiding and Abetting Claims Under the LAD

As to the aiding and abetting claims against the individual defendants, plaintiff argues he established McDowell and Johnson engaged in "active and purposeful conduct" sufficient to establish individual liability because each "performed a wrongful act that caused [p]laintiff to suffer economic loss by not being promoted to an administrative job which will increase his yearly salary," they were "generally aware of [their] role[s] as part of an overall illegal activity at the time [they] provided the assistance" and each "knowingly and substantially assisted in the principal violation." Again, we disagree.

To prevail on an aiding and abetting claim under the LAD, the plaintiff must demonstrate the defendant's "active and purposeful conduct." Cicchetti, 194 N.J. at 594 (quoting Tarr, 181 N.J. at 83). Specifically, "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of [their] role as part of an overall illegal or tortious activity at the time that [t]he[y] provide[] the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation."

Cowher v. Carson & Roberts, 425 N.J. Super. 285, 303 (App. Div. 2012) (last alteration in original) (quoting Tarr, 181 N.J. at 84).

To determine whether the defendant provided "substantial assistance," the court considers: "(1) the nature of the act encouraged, (2) the amount of assistance given by the [defendant], (3) whether the [defendant] was present at the time of the asserted [principal violation], (4) the [defendant]'s relations to the others [involved], and (5) the state of mind of the [defendant]." Ibid. (quoting Tarr, 181 N.J. at 84).

Plaintiff's aiding and abetting claims against Johnson and McDowell fail because he has not shown active or purposeful conduct on the part of either defendant. Nothing in the record demonstrates either Johnson or McDowell performed any wrongful act, was "generally aware" they were assisting an illegal activity, or "knowingly and substantially assist[ed]" any violation. Ibid. As noted, plaintiff has presented no competent evidence, nor a reasonable inference, showing Johnson or McDowell was involved in screening his applications or refusing to interview him. To the contrary, each stated in their respective certifications they did not "provide an[y] input or have any role in determining whether [plaintiff] was interviewed for a particular position" or "take any action impacting [plaintiff's] employment." Plaintiff's unsupported,

self-serving claims of Johnson's and McDowell's involvement are insufficient to create a genuine issue of material fact.

E.  Breach of Contract Claim

Plaintiff next asserts the court erred in granting summary judgment to defendants on his breach of contract claim because defendants "fail[ed] to accurately refrain from retaliating against [him]" and "did not make a good faith effort that actually achieved the essential purpose of the contract."  Defendants respond they did not breach the settlement agreement because they "fairly viewed and analyzed [plaintiff's applications] in accordance with the qualifications and experience set forth in the job posting."  Further, they add plaintiff alleged no damages related to any purported breach, or any malice or bad motive demonstrating a breach of the duty of good faith and fair dealing. Again, we agree with defendants.

An agreement settling litigation "is 'governed by [the general] principles of contract law.'"  Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (alteration in original) (quoting Brundage v. Estate of Carambio, 195 N.J. 575, 600-01 (2008)).  To establish a breach of contract, the plaintiff must show, by a preponderance of the evidence, the following:  "first, that '[t]he parties entered into a contract containing certain terms'; second, that 'plaintiff[s] did what the

contract required [them] to do'; third, that 'defendant[s] did not do what the contract required [them] to do' . . . ; and fourth, that 'defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s].'" Ibid. (all alterations but ellipses in original) (quoting Model Jury Charges (Civil), 4.10A, "The Contract Claim – Generally" (May 1998)).

Plaintiff's breach of contract claim is based upon defendants' alleged violation of the non-retaliation provision in the settlement agreement. Plaintiff argues "retaliate" as used in the contract should be interpreted consistently with CEPA and/or Title VII. Even accepting his interpretation as appropriate, the record fails to support a causal connection between plaintiff's complaints and the Board's decision not to promote him under LAD, CEPA, or Title VII.

To establish a prima facie retaliation claim under CEPA, a plaintiff must demonstrate, inter alia, "a causal connection exists between the [employee's] whistle-blowing activity and the adverse employment action." Allen v. Cape May Cnty., 246 N.J. 275, 290 (2021) (quoting Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)). In determining whether such connection exists, the court may evaluate an employer's or supervisor's response to whistleblowing because a jury could infer inaction by these parties represents complicity or ratification of

improper activities. Battaglia, 214 N.J. at 558-59; Estate of Roach v. TRW, Inc., 164 N.J. 598, 614 (2000).

As noted, plaintiff presented no competent evidence, nor does the record permit a reasonable inference, that the human resources staff responsible for screening out his applications were aware of his complaints or were influenced by same in their decisions not to pass plaintiff's applications to the next stage. Similarly, despite plaintiff's contention defendants' alleged failure to adequately respond to his complaints established causation, McDowell's unrebutted certification indicates the correspondence plaintiff sent about his concerns were "forwarded to human resources to be handled and for any necessary actions to be taken." We are unable to conclude defendants' response to his complaints rises to the level of inaction that would constitute complicity or ratification, such that we should consider it evidence of a causal connection.

Similarly, a prima facie retaliation claim under Title VII requires a plaintiff establish, among other elements, "a causal connection between the employee's protected activity and the employer's adverse action." Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 346 (3d Cir. 2022) (quoting Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015)). Such connection cannot be established "without some evidence that the individuals responsible

for the adverse action knew of the plaintiff's protected conduct at the time they acted." Daniels, 776 F.3d at 196. As noted, plaintiff has not shown the individuals responsible for screening his applications had knowledge of his complaints.

Next, "every contract in New Jersey contains an implied covenant of good faith and fair dealing[, t]hat is, neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]" Wood v. N.J. Mfrs. Ins. Co., 206 N.J. 562, 577 (2011) (alterations in original) (quoting Kalogeras v. 239 Broad Ave., LLC, 202 N.J. 349, 366 (2010)). A claim that a party has breached this implied covenant "should not be permitted to be advanced in the abstract and absent improper motive." Wilson v. Amerada Hess Corp., 168 N.J. 236, 251 (2001).

We are satisfied plaintiff has similarly failed to create a factual question that defendants acted in bad faith such that the implied covenant of good faith and fair dealing was breached. The essential purpose of the settlement agreement was to resolve the parties' outstanding dispute. Nothing in the settlement agreement obligated the Board to promote plaintiff or interview him, particularly where it determined he was not qualified for a position. As noted,

41

plaintiff has not proven the Board acted with an improper motive in determining he would not proceed to an interview because he was not qualified.

F. Recusal

Finally, plaintiff makes numerous additional factual and legal allegations not raised in his pleadings or considered by the court. We generally "decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest." Zaman v. Felton, 219 N.J. 199, 226-27 (2014) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)). Neither exception applies here. However, we briefly address plaintiff's contention the court should have recused itself because it: (1) "ignored or disregarded all [his] filings . . . including time sensitive motions," (2) failed to order "supplemental briefing to clarify a specific issue," which was not further specified, and (3) granted summary judgment against him despite "present[ing] genuine evidence through 12,200 pages of [discovery]."

To determine if an appearance of impropriety exists to justify recusal, the court looks to whether "a reasonable, fully informed person [would] have doubts about the judge's impartiality." DeNike v. Cupo, 196 N.J. 502, 517 (2008); see

also <u>Code of Jud. Conduct R.</u> 2.1 cmt. 3. Although proof of actual prejudice is not necessary, "before the court may be disqualified on the ground of an appearance of bias, the belief that the proceedings were unfair must be objectively reasonable." <u>State v. Marshall</u>, 148 N.J. 89, 279 (1997). That a judge rendered decisions in a case that did not favor the party seeking recusal— even a decision reversed on appeal—is insufficient grounds for recusal. <u>Id.</u> at 276; <u>Hundred E. Credit Corp. v. Eric Schuster Corp.</u>, 212 N.J. Super. 350, 358 (App. Div. 1986).

We discern no objective appearance of unfairness in the record. Plaintiff identified no specific filings the court ignored, and the record shows no bias against him. The transcript of the hearing on defendants' summary judgment motion clearly reveals the court considered plaintiff's arguments in its decision and ultimately rejected them after applying the relevant law. That alone is not sufficient to require the court's recusal.

To the extent we have not addressed any of plaintiff's arguments, it is because we have concluded they lack sufficient merit to warrant extended discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4039-21